**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| **MICHAL HOLZER, Individually and on Behalf of All Others Similarly Situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**BUMBLE INC., LIDIANE JONES, WHITNEY WOLFE HERD, and ANURADHA B. SUBRAMANIAN,**<br><br>**Defendants.** | **Case No. 1:24-cv-1131**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Michal Holzer ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by Bumble Inc. ("Bumble" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Bumble's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Bumble securities between November 7, 2023 and August 7, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Bumble's 2023 fiscal year revenue and expected guidance for the fiscal year 2024. Defendants' statements included, among other things, confidence in their understanding of the desires in their consumer market, growth in revenue per user on the back of the Company's new elevated subscription tier, and a full app relaunch to integrate features the Company claimed would expand their market to more users with a focus on an increase in younger users on their platform.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning Bumble's relaunch strategy, including: Premium Plus and base tiers, focused engagement and more personalized experiences for younger users, and enhancing premium offerings for paid subscription members. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Bumble's securities at artificially inflated prices.

4.      The truth began to emerge on February 27, 2024, when Bumble issued a press release reporting disappointing fourth quarter fiscal 2023 results despite the recent launch of the Premium Plus subscription tier in December 2022.   During the subsequent earnings call, management announced that the Premium Plus tier would be revamped as part of the planned

Bumble app relaunch, as it "did not have a clear enough market fit" at launch.  As a result, Bumble lowered its guidance for full year 2024.

5.      In response to this news, Bumble's stock price declined from $13.18 per share on February 27, 2024 to $11.23 per share on February 28, 2024. However, Defendants materially misrepresented and/or concealed the true risks they faced with respect to capturing the correct balance and mix of people in its customer base and effectively monetizing its subscription tiers.

6.      Investors remained in the dark as Bumble reported its financial results for its first quarter fiscal 2024 results on May 8, 2024. At that time Bumble reiterated the Company's full year 2024 decreased guidance.

7.      On August 7, 2024, Bumble issued a press release announcing mixed second quarter 2024 results. During the corresponding earnings call, Defendants disclosed that the app relaunch was not going to plan and the Company would need to "reset" its outlook to refocus on the "consumer ecosystem" and "rebalance Bumble subscription tiers," including a pause in the revamp of the poorly received Premium Plus tier.  On the back of this news, Bumble drastically cut its fiscal year guidance for a second time. As a result, the price of Bumble stock declined from $8.06 per share on August 7, 2024 to $5.71 per share on August 8, 2024.

8.      Investors have sustained significant damages as a result of Defendants' fraudulent statements. Plaintiff seeks to recover those damages by way of this lawsuit.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of Defendant's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## THE PARTIES

14.     Plaintiff purchased Bumble common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Bumble is attached hereto.

15.     Bumble Inc. is a Delaware corporation with its principal executive offices located at 1105 W 41st Street, Austin, TX 78756. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "BMBL."

16.     Defendant Lidiane Jones ("Jones") has been the Chief Executive Officer and Director of Bumble since January 2, 2024.

17.     Defendant Whitney Wolfe Herd ("Wolfe Herd") was Chief Executive Officer of Bumble from 2014 until January 2, 2024. Wolfe Herd is Bumble's founder and has served as Executive Chair since January 2, 2024.

18.     Defendant Anuradha B. Subramanian ("Subramanian") was, at all relevant times, the Chief Financial Officer of Bumble.

19.     Defendants Jones, Wolfe Herd, and Subramanian are sometimes referred to herein as the "Individual Defendants." Bumble together with the individual Defendants are referred to herein as the "Defendants."

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Bumble reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

21.     Bumble is liable for the acts of its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

22.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Bumble under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

23.     Bumble is an American company, launched in 2014, which purports to be a dating app (the "Bumble App"), and proclaims to be one of the first dating apps built with women at the center, where women make the first move. Bumble App claims to be a leader in the online dating sector across several countries, including the United States, the United Kingdom, Australia and Canada. As of the year ended December 31, 2023, the Bumble App had approximately 2.5 million Bumble App paying users.

24.     In addition to the Bumble App, Bumble owns a suite of other apps, including Badoo, Fruitz, Bumble BFF, and Official. These apps include a variety of different intention-based dating algorithms and platforms, providing users with unique online dating strategies.

### *The Defendants Materially Misled Investors Concerning Bumble's Revenue for Fiscal Year 2023 and Outlook for Fiscal Year 2024*

#### *November 7, 2023*

25.     On November 7, 2023, Defendants conducted an earnings call corresponding to their third quarter fiscal year 2023 results during which the Defendants promoted their new "Premium Plus" subscription tier and introduced Lidiane Jones, who Bumble announced would be taking over the role of CEO effective January 2, 2024.

26.     On the November 7, 2023 earnings call, Defendant Wolfe Herd, Bumble's then-CEO and founder, promoted Bumble's upcoming "Premium Plus" subscription tier, stating, in pertinent part, the following:

As we mentioned last quarter, we are excited to be introducing 2 new subscription tiers for our members.  These will not only enhance our current offerings but also enable us to better and more directly serve the needs of our high-intent, serious dating customers and Gen Z users.

Our higher tier, which will be called Premium Plus, aims to elevate our power members' dating experience to improve their chances for a match. Premium Plus is actively being tested in several countries with promising initial results. Our lower-price tier is also currently in limited testing. This tier is focused on helping our younger members express their personalities on a deeper level and find connection in fun and social ways. Our goal is to expand testing and launch both tiers in coming quarters.

As always, we augment these new features with under-the-hood optimization that are meaningful in improving the user experience.

27.     During a question-and-answer portion of the same earnings call, Defendants further

elaborated on the Premium Plus subscription tier in a discussion with an Evercore analyst as

follows:

<Q: Shweta R. Khajuria – Evercore ISI Institutional Equities – Analyst> Let me try two please … And then second is, could you provide more color on the 2 product subscription tiers, please, the one that's lower priced in terms of the timing, the pricing and the rollout for both plans, please?

. . .

<A: Defendant Wolfe Herd> Yes. Thanks for the question. So let's talk about the 2 different subscription tiers. ***We'll start at Premium Plus. We are really excited about Premium Plus. I want to underpin this by saying that it has actually been largely one of the most requested features, in and of itself, that we have received over a long time now because it delivers a more curated, more high intent, more, we could say, thoughtful experience, right***? You have a better chance of a match and there's a lot of other layers that come with this Premium Plus experience. ***We've been really pleased with the very early indicators and the early results we're seeing***. So you can expect an update in the coming quarter.

And then moving to base tier, this is really focused on the different types of engagement and the more personalized experience that particularly Gen Z enjoys. So the way, call it, 18- to 22-year-olds are looking to express themselves, on themselves, is actually quite different than the older cohorts, even their peers just a few years older. And we are so good at listening, being on the ground and understanding what this age group is really looking for when it comes to meeting people. And so that's what base tier is all about. It is in early testing right now, and

7

we don't have specific timing or pricing to share publicly today, but I can tell you that it will be a low price point. This is really with the intention of expanding payers and creating a more engaging experience for that next generation.

Meanwhile, on the other side of that barbell, ***Premium Plus will be a much more premium experience than that, obviously, and more premium to the current premium offering. And we believe that the blend of this will be protective to ARPPU while expanding payers***.

(Emphasis added).

28.   Defendant and then-CEO Wolfe Herd also discussed the benefits of the CEO transition with a Goldman Sachs analyst during the question-and-answer segment, pertinently stating:

> <Q: Alexandra Christine Kasper Steiger – Goldman Sachs Group, Inc. – Research Analyst> Congrats, Whitney, on your new role. Maybe two questions on the transition here, first one on timing. Could you maybe elaborate a little bit more on the timing of the announcement? When you look at some factors inside the company versus outside, why do you think this is the right time for you to make that move?
>
> And then second, listening to some interviews with Lidiane, it appears that she has a very valuable background in terms of AI and bringing AI features into existing products and services. To what extent is this going to be a focus for her at Bumble? And could it fast-forward some of the AI initiatives you have played out in the past few quarters?
>
> <A: Defendant Wolfe Herd> Thank you for the questions. So the short answer was we didn't make this decision based on timing. This was about finding the right successor, the right leader. The Board and I have been focused on an extremely thoughtful and very deliberate succession plan for some time, and so finding the right leader was really the key. And you already touched upon just one of many of Lidiane's incredible strength, and we'll get into that in a moment. But I have to say the short answer is, with someone as remarkable as Lidiane, and keeping me engaged as the Executive Chair focused on my strength, leaning into my superpowers, right, I think so many of the amazing efforts around our mission, our brand, our marketing, our social impact, our customers, those are things that I'm deeply passionate about and do extremely well.
>
> So allowing me to move beyond the day-to-day and get into this founder mindset on behalf of Bumble Inc., you pair her with me, it's a remarkable opportunity. I don't think people are fully recognizing how powerful that can be. So really,

ultimately, it's going to allow us to both innovate but drive growth across the business, drive new products.

And now moving into your second question, let's just talk about Lidiane for a moment. So first and foremost, she is incredibly unique. She is not only wildly intelligent and capable, she has insane followership. I mean her people that she has led love her. That was always going to be critical for a leader to be my successor. And then when you double-click on her qualities and her experience, she's a software engineer. She speaks system. She speaks the language of technology. She is going to get in there and be not only a technology mind but an incredible product innovator. She is a customer-first product person. If you look at the products she's worked on, These are products we love and adore.

So with the note on AI, the short answer is yes. She is going to show up on day 1. We've been doing so much work on the back end of AI already, ranging from, I would call it, 3 main buckets: tools, where we can integrate different AI tooling to enhance the customer experience, to supercharge the under-the-hood efforts and then also drive efficiencies and drive strength as far as the leadership team and the broader teams go. The second bucket is really the noncustomer-facing efforts that she's going to be leaning into. This is supercharging our algorithms, further enhancing our safety and moderation efforts, using AI as this underpinning supercharge effort to bring the world closer together and to drive healthy relationships. And then the third bucket is the customer-facing stuff. This is what we're all reading about and thinking about all day. This is where generative AI comes in.

She has done this. She knows this. It is natural and native to her. It's not something she needs to learn when she arrives. She will show up day 1 ready to roll. And so we're so excited about the opportunity, what this means for the member journey, the member experience. And we think this gives us a massive competitive edge.

So with that, I hope you can hear it in my voice, I am in this to win this. She is so excited, and I think we are going to embark on Bumble's most exciting chapter yet.

29.    During the same call, Defendant Subramanian detailed the Company's full-year

2024 outlook as follows:

> *As we look ahead to 2024, our fundamental strategy remains unchanged, and we are very excited about the future of our business*. We have an exceptional brand that is loved and used by nearly 4 million paying users around the globe and growing. We have a strong product pipeline that leverages innovative technologies while prioritizing safety for our users. We are just beginning to

9

realize the potential of our apps, and we see tremendous opportunity to continue to expand our reach in more countries.

As we work to refine our planning for next year, we expect another year of solid growth for our family of apps. At the same time, our preliminary outlook also takes into consideration the early stage of our planning process, our leadership succession plan, the trends we are seeing and expected headwinds from FX. ***As such, our initial assumptions for 2024 are for total Bumble Inc. year-over-year revenue growth rate to be at least in the low teens.*** This assumes approximately 150 basis points of estimated year-over-year headwinds from FX. On an FX-adjusted basis, this would translate to a growth rate of approximately 15%.

As we finalize our investment priority for next year, we will continue being disciplined on our spend. We expect full year adjusted EBITDA margin to expand between 50 to 100 basis points next year. We will share a more comprehensive outlook in our next earnings call when we discuss Q4 results.

Second, in our U.S. Healthcare segment, we expect profitability to improve from optimizing the clinic footprint, growing patient panels and realigning costs. Third, we expect growing contributions from retail initiatives, including sequentially improving retail comps and margin expansion programs. Finally, seasonality plays a role in our business, benefiting the second quarter, which is usually the height of the cough, cold, flu season in the U.S. and is when Boots U.K. sees significant profit driven by the holiday season.

(Emphasis added).

30.    Defendant Subramanian elaborated further during the question-and-answer portion

of the call, answering a question from an analyst at JPMorgan Chase as follows:

<Q: Cory Alan Carpenter – JPMorgan Chase & Co.> . . . And then Anu, thank you for the initial '24 guidance. Curious, at a high level, any framing that you would put around expected contribution from Bumble App, Badoo or ARPPU versus payers?

<A: Defendant Subramanian> … To your second question, just to elaborate a little bit on how we are thinking about 2024 guidance, now obviously, as you can imagine, we are still very much in the planning stages for next year and there are still a lot of moving parts in terms of how we are thinking about 2024. I will say that there is a ton of excitement around what the product road map looks like, what our international plans are. And the teams are very, very deep in the middle of putting all of those on paper. And so far, we are very, very excited about what this means for us for next year.

We wanted to provide some high-level numbers, so all of you can have some context going into next year, recognizing that we have a CEO transition

succession in place. And so we will be evolving our thinking as we get into our Q4 earnings and into 2024 specific guidance. Right now, we are thinking about total Inc. revenue, like I said, at least in the low teens. We do have a 1- to 2-point of FX headwind next year. So that's why on an ex FX basis, on a like-for-like basis, you're talking about Inc.-level growth of about 15%. That's how we're thinking about total 2024 guidance.

If you look at the components of it, we are very, very excited that we will see strong contributions from Bumble as well as Badoo, which is on a good path to stabilization. Bumble BFF will largely be a contributor from a user growth perspective. We do have some monetization plans, but a lot of it will still be in testing next year. And Fruitz and Official are also exciting additions to the business. For Bumble App, again, more to come on that. But you should assume that we are looking at revenue growth rates slightly above where the company growth rates are. So let's say, low to mid-teens is where we are looking at Bumble App guidance.

31.     Also on November 7, 2023, Defendants issued a press release announcing Bumble's third quarter fiscal year 2023 results for the quarter ended September 30, 2023. Defendant and then-CEO Wolfe Herd stated, in relevant part:

Our strong third quarter results reflect our powerful brand, commitment to innovation, and relentless focus on helping people connect with one another. ***By continuing to execute successfully on growth initiatives, we are strengthening our market leadership in online dating and making progress on the sizable opportunity beyond dating.***

(Emphasis added).

<u>*November 28, 2023*</u>

32.     On November 28, 2023, Defendant Subramanian presented on behalf of Bumble at the 2023 UBS Global Technology Conference.

33.     During the call, in response to a question on the topic, CFO Subramanian again promoted the Company's new Premium Plus subscription tier and discussed its place among Bumble's existing subscription tiers, pertinently as follows:

<Q: Christopher Louis Kuntarich – UBS Investment Bank – Analyst> Got it. And just moving on to the 4 tiers that you have. So you have Bumble Boost that we talked a little bit about earlier and then Premium already in the market and then you're testing planning to launch the new tier below

11

Boost, the Bumble Bizz, and then you're going to have the Bumble Premium Plus a tier above the Bumble Premium. So I guess just how is testing coming along? And like what are you looking for really for these different tiers that really start scaling here?

<A: Anuradha B. Subramanian> Yes. So when we thought about adding additional tiers, we really thought about it from the point of what the user pain point was, right? ***And if you think about Premium Plus, we had heard from a lot of our existing premium users that they would be willing to pay a lot more for a curated experience that came in at a higher price point that allowed them to shorten the length and time from onboarding to a match*** as an example, right? So the goal for Premium Plus is really much more around how do you improve and increase the relevance of the matches that we are giving you and make it much more appealing to that cohort of users. ***And I think we do expect to upsell users from Bumble Premium to Premium Plus, and that should be a nice RPP [Revenue Per Payer] driver for us.***

And then on the Bizz tier, the goal was really to say, we have a lot of people, especially the younger cohorts that use the app for free, but are never probably going to pay for Bumble Boost or Bumble Premium right now because they just don't find -- feel the need to. So we said, okay, how do you create products that they would be willing to pay for, right? How do you create things that allow them to be more expressive, right, whether it's stickers, images, whatever the case might be? So that's how we started to think about the lower tier. And that should be a nice sort of driver of payer penetration because, again, these are users that are using the app daily quite actively. It's just about getting them to open up their wallet and pay for something.

(Emphasis added).

34.    The above statements in Paragraphs 25 to 33 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth on the back of its tiered-subscription options and subsequent app relaunch, while also downplaying the potential disruption to Bumble's brand and reputation caused by the imminent change in leadership. In truth, Bumble's Premium Plus subscription plan did not have a clear market fit and would very quickly need to be revamped. Bumble's tiered-subscription options were ill equipped to provide the

claimed revenue per user benefit to the Company's faltering market share, particularly regarding user growth and monetization. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

***The Truth Begins to Emerge***

*February 27, 2024*

35.     On February 27, 2024, the Company reported fourth quarter and full year 2023 results and, pertinently, cut their full year 2024 guidance as follows: total revenue growth of 8% to 11% and Bumble App revenue growth of 9% to 11%. Regarding the adjusted EBITDA margin growth: at least 300 basis points, which excludes expected severance and other non-recurring charges related to the transformation initiative of between $20 million and $25 million.

36.     During an earnings call following Bumble's updated guidance, Defendant Jones also debuted a "bold plan to transform Bumble" that she claimed would "lead the company to its next phase of growth and innovation." She continued, in relevant part:

> We are taking significant and decisive actions that ensure our customers remain at the center of everything we do as we relaunch Bumble App, transform our organization and accelerate our product roadmap.

37.     During the same-day earnings call, Defendant Jones provided details on the launch of the Premium Plus subscription tier and the planned app relaunch, pertinently stating:

> Over the past 18 months, we launched a number of new features in Bumble App, which while individually promising, have in aggregate slowed the overall app performance and cluttered the user experience. ***Additionally, our new pricing tier introduced last December, Premium+, has also not had a clear enough product market fit.***
>
> These are things we strongly believe are in our control to solve, and we're doing so with 4 major steps. ***First, in Q2 of this year, we plan to reignite Bumble's strength by relaunching Bumble App with a compelling modern experience, geared toward capturing a broader audience and aimed at having a stronger appeal to younger users, easing the profile creation experience, optimizing the core performance of the app, and***

> *strengthening our AI capabilities to enhance fake account detections and bring profile picture insights to lead our customers to success faster.*
>
> As a part of this release, **we will also revamp our Premium+ offering**. These efforts will be a significant moment of evolution for us in bringing women's empowerment to the core of our experience. This relaunch will also provide us with a strong platform for ongoing innovation. It will come with a new marketing campaign across our core markets, extending our reach and showcasing the benefits of our offerings. This is the first major overhaul of Bumble App in the past 2 years, and I'm very proud of our team for embracing a faster pace of innovation and marking the start of a new phase of customer experiences in the online dating category.
>
> …
>
> ***The steps we're taking today set the stage for our next chapter of growth***. We have work to do, but you have my full commitment that we'll innovate and sharpen our focus on execution to create a durable foundation for our business. I look forward to meeting our stakeholders to better understand their needs in the weeks and months ahead. ***And we'll be open and transparent in communicating progress on our strategy as we move forward.***

(Emphasis added).

38.    Additionally, during the same earnings call, Defendants unveiled slashed guidance

for the full year 2024; Defendant Subramanian stated, in pertinent part:

> Now moving on to our outlook for 2024. As Lidiane just mentioned, we are adjusting our 2024 revenue outlook to reflect Bumble App's slower-than-expected start to the year and app-specific execution challenges. We feel confident that these issues are within our control, and we are actively working to resolve them. We expect that the Q2 relaunch of Bumble App, along with the launch of other key features on our product road map, will reaccelerate growth in the second half of 2024.
>
> **As a result, for full year 2024, we estimate total Bumble Inc. revenue growth rate of 8% to 11%.** This assumes FX will be approximately a 1-point headwind during the year. We expect Bumble App revenue to grow between 9% to 11% year-over-year. Our Bumble App revenue outlook includes expectations for full year net adds of approximately 350,000 to 400,000. On the cost side, the bold actions we announced today around our workforce transformation allow us to gain significant operating leverage and put us on a strong path towards our goal to continue expanding margins.

We estimate future annualized OpEx savings from this workforce reduction to be approximately $55 million, of which we expect to selectively reinvest approximately $15 million in areas of product engineering, safety and brands that will help drive long-term growth. As a result, for 2024, we expect at least 300 basis points of year-over-year adjusted EBITDA margin expansion.

In 2024, we expect to incur approximately $20 million to $25 million of severance and other related charges primarily in the first half related to this transformation, and our adjusted EBITDA outlook excludes the impact of these charges. For Q1, we expect total revenue between $262 million and $268 million, representing a growth rate between 8% to 10%. We expect Bumble App revenue to be between $211 million and $215 million, representing a growth rate between 9% and 11%.

Our Bumble App revenue outlook includes expectations for sequential net adds of approximately 30,000 to 40,000 in Q1. We estimate adjusted EBITDA will be between $67 million and $70 million, representing 26% margin at the midpoint of the range.

(Emphasis added).

39.     Similarly, during the subsequent question-and-answer portion of the call, CFO Subramanian elaborated on the financial impacts and projects related to the shortcomings of the Company's launch of the Premium Plus subscription tier and the planned app relaunch, pertinently stating the following:

> <Q: Alexandra Christine Kasper Steiger – Goldman Sachs Group, Inc. – Research Analyst> . . . And then one follow-up for Anu on the '24 guidance. So I do want to ask about your updated '24 guide and some of the assumptions that went into it now that Q1 is calling for a more pronounced deceleration in growth. So could you maybe talk about what are you seeing in the business today that is informing your view? And in that context, could you also elaborate a little bit more on like the execution challenges you referenced in your prepared remarks?
>
> . . .
>
> <A: Defendant Subramanian> Sure. Thanks, Lidiane. Alex, so maybe I'll just break down the guidance a little bit, starting with Bumble App and what has changed for us from our prior guidance. So while our top of the funnel has remained strong in many of our global markets, we are seeing a slower-than-expected start to the year, primarily in the U.S., and the usual Q1

seasonal rebound that we normally expect to see has been less pronounced than in the past.

*Second, as Lidiane said in her prepared remarks, some of the newer products such as Premium+, which we launched at the end of December, while they have been revenue positive, they are not showing the incremental uplift that we would like to see and that we had originally anticipated. And so for these reasons, we are adjusting our revenue outlook for Bumble App to be 9% to 11% for the full year.*

*And as you've heard today, we are taking immediate and swift actions to make the changes that we need to make to the product road map.* And with the planned relaunch of the app in Q2, which will be accompanied by the marketing campaign, we expect that our revenue will accelerate in the second half post this launch. And then we have a slew of other features that we are excited about on the product road map that we will then proceed to launch with in the second half of the year. So hopefully, that gives you a flavor for how we're thinking about Bumble App for the rest of the year.

(Emphasis added).

40.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the November 7, 2023 earnings call and November 23, 2023 presentation.  On those calls, Defendants praised the upcoming launch of their new Premium Plus subscription tier and claimed that the new offering would not only protect the Company's average revenue per paid user but would further provide revenue growth per user as subscribers would purportedly move up the tiered subscriptions.

41.     Investors and analysts reacted immediately to Bumble's revelation. The price of Bumble's common stock declined dramatically. From a closing market price of $13.18 per share on February 27, 2024, to $11.23 per share on February 28, 2024.

42.     Notwithstanding Defendants' disclosures during the call, they continued to mislead investors by misrepresenting their understanding of the issues they claimed the new pricing tier and Bumble app relaunch were aimed to address in their issuance of reduced financial guidance.

In doing so, Defendants deceptively claimed confidence in their planned efforts to expand their user base, particularly with a younger audience, and optimize the app experience.

<u>*March 4, 2024*</u>

43.    On March 4, 2024, Defendants Jones and Subramanian presented on behalf of Bumble at Morgan Stanley's Technology Media & Telecom Conference 2024.

44.    During the presentation, Defendants highlighted their confidence in the Bumble app's relaunch and corresponding revamp of the Premium Plus subscription tier to drive ARRPU growth during the following question-and-answer segment, in pertinent part, as follows:

> <Q: Nathanial Jay Feather – Morgan Stanley – Research Associate> Okay. Great. And one more on the flip side of payers is also [ ARPPU ] I guess, looking to '24, how should we think about that balance between the payer growth you just mentioned? And then our [ ARPPU growth ] how that should trend through the year?
>
> . . .
>
> <A: Lidiane Jones> I may add a couple of points to what Anu shared. When you look at net adds, one of the key factors that we are looking at is quality net adds. ***We want our users coming into the platform that are going to engage and stay in the platform.*** And so we're really measuring the duration and engagement of those users. We're not trying to just get a total number of net adds that churn out. So that's a really important part of our growth strategy moving forward.
>
> ***And then the ARPPU, one of the big things that we're doing, especially with our Q2 launch, is looking at the value -- clarity of value across the different tiers that we're offering***. And as we've seen, Bumble has been tremendously successful at this at the -- in its history, customers. ***A lot of our customers are at the premium tier, but we didn't see as much retention of our customers when we launched Premium+.***
>
> ***So we are adding more capabilities to Premium+ so that users stay there. So you see a natural -- to Anu's point, natural sustainability of our ARPPU towards the higher tiers because our users will see greater value at staying at there***. So we're really excited about that. ***I think that release is going to provide greater value to ARPPU goals this year and moving forward as well.***

<Q: Nathanial Jay Feather> Okay. Great. Well, I want to take just a touch more into that on Bumble Premium+ the high-end tier. I guess what do you think were the primary reasons why that wasn't getting the adoption you had anticipated? And then with the relaunch, I guess, how should we think about the payer funnel between Bumble Premium, Bumble Premium+ and how that should move going forward?

<A: Lidiane Jones> Yes. ***We learned a tremendous amount since the December launch of the Premium+.*** One of the areas that we emphasize to this particular offering was just giving more of everything. So you think have more swipes, more highlights and that certainly drives demand. And we saw really solid demand for it. A lot of users signed up. What caused -- so we're still net revenue positive with it. So it's not a terrible release, ***but we're not seeing the sustainability of people staying in that Premium offering. They're going back down to Premium instead of staying on Premium+.***

So what we are focusing on is adding features -- unique features that you only get if you are a Premium+. So that way, there is a sustained value at staying at that offering. Premium has been incredibly successful. So we know we're not churning out our users they're staying with us, they're just going down to Premium instead of staying in Premium+. So great demand is not sustaining those users.

***Features now that will add regular value, some of them focused on engagement metrics and insights, what are people reacting to the most in terms of features or opening moves or opening statements that users are making to that initial matching connection.*** We can provide a lot of those insights. Again, those are AI-powered capabilities that help our users gain more insight and more value to what they're getting out of that offering. So we just want to, again, seize the demand that we saw and sustain it, which will help our people overall.

<Q: Nathaniel Jay Feather> Okay. Great. Now we talked a little bit about the relaunch earlier. But I want to really dive into that planned launch coming up in 2Q, so relatively soon. Can you talk through in a bit more depth, the real rationale behind going through the relaunch? And then how should investors think about the features and product goals and what will really mark a successful relaunch there?

<A: Lidiane Jones> Yes, it's a great question. ***The team had been looking at a lot of different areas of customer feedback and different pockets of improvements on the product.*** But if you heard in my earnings call, one of the key learnings for me coming in is that things are being done very siloed. Even some of our own testing was being done very siloed. Is this particular feature testing? And what we've done is done a full end-to-end look at what

18

is driving engagement? What is driving actual conversion and retention of these users? It's the full experience. It's not just one isolated feature.

**So this release is really focused on the end-to-end customer success.** So some of the features that we -- pockets of customer feedback, profile experience. We haven't dramatically changed that over the last few years. **So we are really revamping our profile experience with shortening that overall set of steps**. We're still using questions that are more comfortable for people to engage in, which has translated in terms of what we have seen on the rollout of it. From a testing perspective, we are seeing higher-quality profiles, higher engagement and higher conversion.

**So I think there's just a real truth to when you do right by your customers, they will be happier**. So that profile is a big part of what we're changing. A couple of other capabilities that we're looking at is enhancing that first experience. You may know Bumble, like everybody knows Bumble, as women make the first move. If you ask women, especially younger women, we're pretty tired of having to make the first move all the time. So this release is going to be a next generation of women's empowerment. This is going to be about women decide if they want to make the first move.

So that's a pretty big change for Bumble and one that we're incredibly excited about. So this is a Bumble's year for you or all of our audience. And then the last thing is we're adding some additional, as I mentioned the insights more differentiated experience for Premium+. And we're adding some more safety capabilities, especially as it relates to ID verification. **So I'm really -- again, it's a full revamp of the product. I'm probably not doing justice. There's a lot more features that the team is working on. But I am thrilled. This is -- us setting the next decade of women's experience and dating for Bumble, which I'm thrilled about.**

(Emphasis Added).

<u>May 8, 2024</u>

45.    On May 8, 2024, Bumble published its first quarter fiscal 2024 results and reiterated the Company's full year 2024 guidance.

46.    A corresponding earnings call was held the same day during which Defendants spoke on their app relaunch and plans for their Premium Plus subscription tier. Pertinently, Defendant Jones stated the following:

That brings us to our Bumble App relaunch last week, where we showcased the first chapter of our extended vision for Bumble and how we're

19

innovating to make our customers' dating experience even better. Our refreshed brand identity and new product features are designed to support 3 goals; improve the core experience of our customers, enhance trust and safety and increase our options for monetization.

. . .

Finally, we're expanding monetization with our updated Premium+ subscription tier. We continue to have conviction that our subscription tiers are designed to bring value to our customers by offering them the fastest path to finding their matches. Premium+ is built on this principle, and we increased its value in this release by updating the feature set with personalized photo insights and better match curation.

We see Premium+ as a valuable future revenue stream and expect to continue to add additional features and optimize pricing for the subscription tier. Beyond Premium+, we're continuing to run global pricing optimization and expanding further into existing growth markets in Western Europe, LatAm and Asia. Overall, the Bumble app launch feedback from customers has been tremendously valuable to us.

47. The above statements in Paragraphs 35 to 46 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to their consumer market, resulting in Defendants' confidence that the relaunch of the Bumble app, its associated marketing campaign, and the connected revamp of the Company's Premium Plus subscription tier would boost the Company's growth through an expanded user base and increased revenue per paid user in the second half of the year. To the contrary, Defendants expectations had little, or an otherwise erroneous, basis. In truth, much like Bumble's Premium Plus pricing tier, the Company's app relaunch was merely a desperate attempt to keep pace with competition overshadowing Bumble's growth in the sector.

### *The Truth Emerges*

#### *August 7, 2024*

48. On August 7, 2024, Defendants released mixed Q2FY24 results and drastically cut FY24 projections as follows: total revenue year over year growth in the range of 1% to 2% and

Bumble App revenue growth in the range of 1.5% to 2.5%. Regarding the adjusted EBITDA margin growth: at least 200 basis points.

49.     During the same-day earnings call, Defendant Jones made it clear this "projection reset" is the result of Bumble's "difficult but important *decision to reset our strategy* to deliver durable customer value by addressing two fundamental and interconnected challenges" (emphasis added). She continued, in pertinent part:

> First, we need to ensure we're capturing the right balance and mix of people in our customer ecosystem. This entails correcting demographic imbalances and improving retention by providing our customers with more innovative and compelling dating experiences.
>
> And second, we need to monetize more effectively while ensuring a great experience for both our free and paid customers
>
> . . .
>
> Over time, we'll rebalance Bumble subscription tiers and merchandising in favor of mechanisms that reward positive peer behaviors and support better ecosystem health. *As part of this process, we'll slow down certain monetization initiatives in the near term, including the extension of Premium+.*

(Emphasis added).

50.     Defendant Subramanian detailed the financial outlook in accord, stating, in pertinent part:

> Now moving on to our outlook for the rest of the year. *We are intentionally resetting our outlook today that reflect the execution of the customer-focused strategy Lidiane just outlined.* In the process of strengthening our ecosystem and improving the customer experience, we plan to prioritize product and marketing investments that will improve engagement and ecosystem health, particularly in our more mature market. This will include expanding our efforts around safety and improving the mix and intent of customers on our app.
>
> In addition, as we align our revenue strategy to deliver broader customer value across all subscription tiers, *we will also slow down certain monetization efforts like Premium+ that we had originally planned for in the second half of the year*. All of these factors in aggregate will impact

our near-term top-of-funnel user growth and monetization but we have high confidence that these are the necessary steps for us to reignite user growth, drive sustainable revenue and capture customer value in the long term

. . .

For full year 2024, we now expect total Bumble Inc. revenue growth between 1% and 2%. We expect Bumble App revenue growth between 1.5% to 2.5% with full year Bumble App Net adds of approximately 275,000 to 285,000. This implies that we expect to see negative net adds in Q4 of this year. While this is partly driven by seasonality, it primarily reflects the actions I just outlined.

(Emphasis added).

51.     The aforementioned press release and statements made by the Individual Defendants were misleading and in direct contrast to Defendants' prior statements, including those made during the February 27, 2024, March 4, 2024, and May 8, 2024, earnings calls and presentations. On those calls, Defendants confidently claimed that the app relaunch and the integrated revamp of the Premium Plus subscription service were focused on customer-focused desires and would improve the Bumble App experience, improve the Company's brand identity, and drive revenue growth in the back half of 2024 and onward. In truth, Bumble had yet to successfully monetize its updated Premium Plus subscription tier, calling it a "future revenue stream" and was still working on improving the core experience, as well as trust and safety, from user perspectives. Defendants misled investors by providing the public with materially flawed statements of confidence and growth projections which did not account for these variables.

52.     A number of well-known analysts who had been following Bumble reported on the Company's lowered guidance in response to Bumble's disclosures. For example, RBC Capital Markets released a statement regarding Bumble's recent issues, stating, in pertinent part:

To say BMBL had a tough qtr would be an understatement. Through a combination of top-of-funnel softness and self-inflicted pullbacks on monetization tools, the company guided down significantly and has gone

> back to the literal drawing board on product development to drive better
> virality, user experience and ultimately monetization

53.     Similarly, Piper Sandler released a statement on Bumble's shockingly low current

estimates, as well as the Company's uncertain future, stating, in relevant part:

> While we were expecting estimates to get reset, we were certainly not
> expecting the revision to be of this magnitude. The strategy has quickly
> pivoted from an app refresh to a full-blown multi-quarter revamp. To us,
> the biggest uncertainty coming out of the print remains whether estimates
> have been cut enough or are we in a position for a few more quarters of
> choppiness.

54.     As a result, investors and analysts reacted immediately to Bumble's revelations.

The price of Bumble's common stock declined dramatically. From a closing market price of $8.06

per share on August 7, 2024, Bumble's stock price fell to $5.71 per share on August 8, 2024.

### *Loss Causation and Economic Loss*

55.     During the Class Period, as detailed herein, Defendants made materially false and

misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of Bumble's common stock, or maintained levels of artificial inflation

in Bumble's common stock price, and operated as a fraud or deceit on Class Period purchasers of

Bumble's common stock by materially misleading the investing public. Later, Defendants' prior

misrepresentations and fraudulent conduct became apparent to the market, the price of Bumble's

common stock materially declined, as the prior artificial inflation came out of the price over time.

As a result of their purchases of Bumble's common stock during the Class Period, Plaintiff and

other members of the Class suffered economic loss, i.e., damages under federal securities laws.

56.     Bumble's stock price fell in response to the corrective events, as alleged supra. On

these dates, Defendants disclosed information that was directly related to their prior

misrepresentations and material omissions concerning Bumble's subscription enrollments, forecasting processes and 2024 full-year financial guidance.

### *Presumption of Reliance; Fraud-On-The-Market*

57.     At all relevant times, the market for Bumble's common stock was an efficient market for the following reasons, among others:

(a)     Bumble's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Bumble communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Bumble was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Bumble was reflected in and incorporated into the Company's stock price during the Class Period.

58.     As a result of the foregoing, the market for Bumble's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Bumble's stock price. Under these circumstances, all purchasers of

Bumble's common stock during the Class Period suffered similar injury through their purchase of Bumble's securities at artificially inflated prices, and a presumption of reliance applies.

59.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

60.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

61.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

62.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

"forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Bumble who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Bumble's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

64.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bumble's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Bumble or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions. As of July 31, 2024, there were approximately 126.5 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Bumble;

(c)     whether the Individual Defendants caused Bumble to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of Bumble's common stock during the Class

Period were artificially inflated because of the Defendants' conduct

complained of herein; and

(f)     whether the members of the Class have sustained damages and, if

so, what is the proper measure of damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

***Against All Defendants for Violations of
Section 10(b) and Rule 10b-5 Promulgated Thereunder***

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bumble common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Bumble's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Bumble's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

73.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or

directors of the Company, the Individual Defendants had knowledge of the details of Bumble's internal affairs.

75.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Bumble's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Bumble's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Bumble's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

76.    During the Class Period, Bumble's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Bumble's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

Case 1:24-cv-01131   Document 1   Filed 09/24/24   Page 31 of 35

and the Class, the true value of Bumble's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Bumble's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

77.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against the Individual Defendants
### for Violations of Section 20(a) of the Exchange Act

79.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Bumble's misstatements.

81.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Bumble which had become materially false or misleading.

82.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Bumble disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Bumble to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bumble's common stock.

83.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Bumble to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

84.     By reason of the above conduct, Bumble is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 24, 2024          Respectfully submitted,

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/ Stuart L. Cochran*
Stuart L. Cochran
State Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3804
Facsimile: (214) 691-6311
Email: scochran@condontobin.com

-and-

Adam M. Apton (*pro hac vice* forthcoming)
LEVI & KORSINSKY, LLP
33 Whitehall Street, 17th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

33

# Certification of Plaintiff Pursuant to Federal Securities Laws

I,  Michal Holzer                              , duly certify and say, as to the claims asserted under the federal
_____
Name

securities laws, that:

1. I have reviewed a complaint filed in the action.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Bumble Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this:

Sept 23rd 2024
_____
Date

Michal Holzer
_____
Name

_____
Signature

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 06-13-2024 | P | 300 | $ 11.5000 |
| 08-07-2024 | P | 100 | $ 06.2000 |